(January 22, 1985)

■ CITIBANK, N. A., et al., Respondents, v ALLAN R. PLAPINGER et al., Appellants. — Judgment, entered March 12, 1984 in Supreme Court, New York County (William P. McCooe, J.), granting plaintiffs summary judgment pursuant to CPLR 3212 in the amount of $19,211,889.14, is affirmed, with costs.

In this action upon promissory notes, defendants seek to avoid the express terms of a "Shareholders' Guaranty Absolute" which they executed, by alleging fraud in the inducement, as per certain alleged oral promises. (Cf. *Millerton Agway Coop. v Briarcliff Farms,* 17 NY2d 57.) "Though oral proof may be admitted to show that a written pact was obtained by a fraud in its inducement, such evidence, in order to defeat a motion for summary judgment, must be genuine and based on proof, not shadowy and conclusory statements." (*Hogan & Co. v Saturn Mgt.,* 78 AD2d 837; accord *State Bank v Roarke,* 91 AD2d 1093, 1094; *Thrift Credit Corp. v American Overseas Trading Corp.,* 54 AD2d 994, 994-995.) Both the language of the "Guaranty" and the circumstances of defendants in executing that document evidence an arm's length transaction, clearly and completely expressed by the writing. (Cf. *Seaman-Andwall Corp. v Wright Mach. Corp.,* 31 AD2d 136, 138, affd 29 NY2d 617.) Special Term correctly gave summary judgment to plaintiffs. Concur — Sullivan, Ross and Carro, JJ.

Murphy, P. J., dissents in a memorandum as follows: Defendants, officers and directors of United Department Stores (UDS), a bankrupt New Jersey corporation, own all of UDS' voting shares. UDS was a holding company for a number of retail department store subsidiaries. In June of 1980, UDS commenced negotiations for the purchase of the retail assets of Outlet Co. (Outlet). UDS sought financing from Citibank and Citibank Retail Services, Inc. (CRSI), who were familiar with Outlet's affairs. These negotiations culminated in UDS' $38 million purchase of Outlet's retail assets, a purchase financed, in the main, by a $26 million loan by CRSI collateralized by the accounts receivable of a UDS subsidiary. Outlet accepted two promissory notes in the total amount of $10 million from Wallace R. Plapinger and defendants loaned UDS $2 million to complete the purchase financing.

The major acquisition of Outlet's retail assets in November, 1980 left UDS in need of working capital for its expanded operations. Citibank, together with the four other plaintiff banks, agreed to provide UDS with a $15.2 million revolving line of credit (referred to by the parties as "the Revolver"). It was understood that the Revolver credit loan would be restructured as a term loan and a line of credit. Defendants did not personally guarantee repayment of the Revolver credit loan.

UDS encountered almost immediate financial difficulties and defaulted under the terms of the Revolver loan. Discussions among the parties ensued concerning the restructuring of the Revolver during which the possibility of an $8-10 million line of

credit in addition to a term loan was raised by UDS. Citibank, represented by Paul Froehler, James Harris and Stephen McLintock, indicated that it wanted UDS to sell certain real estate. Citibank also initiated discussions concerning personal guarantees of the restructured loan by the shareholders. A commitment letter with respect to the $15.2 million term loan was signed on June 9, 1981. Defendant Allan R. Plapinger, president of UDS, alleged in opposition to the motion for summary judgment at bar that, "I advised Froehler that the other three shareholders and I would not sign the commitment letter without agreement to the line of credit which was needed by UDS. Froehler promised that we had the line." Plapinger further alleged: "On August 10, 1981, the term loan transaction closed. From June until the closing, UDS had been advised by Citibank that the line of credit was approved. Citibank was well aware through our repeated advice that the line of credit was essential for operating funds for the continued operation of UDS in its expanded condition. Although we expected the line of credit to be closed immediately following the term loan, Citibank's representative told Gerald Nathanson and me to come in the next day and the line of credit would be funded." After repeated inquiries, defendants were informed that the line of credit would not be funded.

Without the letter of credit, UDS found itself in the same financial straits it had experienced a year earlier and, on January 25, 1982, filed a voluntary petition for relief under the Bankruptcy Code. Pursuant to the terms of the loan agreement, Citibank declared the principal and accrued interest due, and by this action seeks repayment from the individual guarantors of the amended and restated loan agreement. Aside from the fact that it was a term loan, there is no indication in the record that this new agreement differed from the original Revolver credit loan in any material respect save for defendants' guarantees.

Defendants asserted affirmative defenses and counterclaims alleging fraud in the inducement and negligent misrepresentation. These defenses were based upon the oral representations of plaintiffs' representatives that the $8 million line of credit had been approved and would be funded at or about the time of the closing of the $15.2 million term loan. As established by the Plapinger affidavit, plaintiff National Bank of Detroit had processed its part of the line of credit to the point where UDS had executed a $4 million note in connection therewith when the term loan closed.

Special Term, holding that defendants had waived the right to assert their defenses because of the language of the uncondi-

tional shareholders' guarantees and that the defenses interposed were not provable as a matter of law, granted plaintiffs' motion for summary judgment, struck defendants' affirmative defenses and counterclaims, and directed entry of judgment for over $19.2 million.

On appeal, we take as facts that plaintiffs' agents, prior to August 10, 1981, represented that the $8 million line of credit had been approved and that defendants reasonably relied upon such representations in deciding to become personally liable for a $15.2 million corporate debt in the event of default. The materiality of the plaintiffs' representations concerning the line of credit to defendants' execution of their guarantees is evident from Plapinger's affidavit. Plaintiffs have not replied to any of the allegations in the Plapinger affidavit. The moving affidavit of David A. Dodge, a Citibank vice-president, does not mention the $8 million line of credit or the representations made by the plaintiffs in connection with it. Indeed, it does not appear that Dodge was present at any of the relevant negotiations referred to by the defendants.

A guarantor may assert as a defense that his undertaking or the principal debtor's contract is void for illegality, or that the guarantee is voidable because of fraud. (57 NY Jur, Suretyship and Guaranty, § 240; see, also, 12 Williston, Contracts [3d ed], § 1499.)

The issue is not whether the contracts of guarantee were unconditional but whether they were contracts at all. The parol evidence rule does not bar evidence of misrepresentations made to induce a party to enter into a contract of guarantee. Hence, summary judgment should not be granted where the oral inducements to enter into such a guarantee consist of promises of additional credit and the written guarantees are unconditional and say nothing as to the alleged representations. (*Millerton Agway Coop. v Briarcliff Farms*, 17 NY2d 57, 60.)

Defendants do not seek to introduce evidence in order to alter the terms of UDS' obligations or to modify the circumstances under which they may be called upon to answer for the corporation's default. They want only to prove fraud or negligent misrepresentations in order to rescind their guarantees. The cases relied upon by the plaintiffs may be distinguished on that ground. In *Meadow Brook Nat. Bank v Bzura* (20 AD2d 287), the guarantor sought to avoid liability because of the failure of the bank to secure the guarantees of two other individuals in contravention of the bank's alleged oral promises. The court held that the allegation of this oral condition precedent contradicted provisions of the guarantee which gave the bank the right to alter

or cancel, without notice, the obligation of any other guarantor and the right to hold the defendant primarily liable in the event of default. (*Supra,* at p 290.) In a similar vein, the guarantor in *Silbert v Silbert* (85 AD2d 661) sought to assert a setoff and counterclaim based upon alleged defamatory statements which had been the subject of a final arbitration award despite specific prohibitory language in the guarantee. The identical considerations barred the guarantor in *Bank of N. Y. v Cariello* (69 AD2d 805) from asserting a counterclaim where he had waived the right to do so in the promissory note and guarantee. The guarantors of the loan in *Chemical Bank v Nattin Realty* (61 AD2d 921) were prevented from introducing evidence of an oral agreement so as to change the due date of the principal obligation. Similarly, a guarantor of payment may not change his status to that of a guarantor of collection by forcing the obligee to resort to security in direct contravention of specific language in the guarantee. (*Community Nat. Bank & Trust Co. v Intercoastal Trading Corp.,* 55 AD2d 525.)

Defendants should not be barred from proving that they would not have entered into their guarantee but for the fraudulent or negligent misrepresentations of the plaintiffs. At the execution of the amended and restated loan agreement, UDS already had a $15.2 million credit loan from the plaintiffs, which was not guaranteed by the defendants. It is certainly true, as plaintiffs argue, that the parol evidence rule promotes security in business transactions. But while there is a strict duty on the guarantor's part to pay in accordance with his contract, there is a concomitant duty on the creditor's part to deal fairly with the guarantor. (See Calamari and Perillo, Contracts, § 9-20.) The creditor's duty to deal with the surety in utmost good faith in every step of the transaction requires the creditors to disclose fully every point which is likely to bear upon the surety's disposition to enter into his undertaking. (57 NY Jur, Suretyship and Guaranty, § 101.) Clearly, the allegations in the Plapinger affidavit raise triable issues concerning fraud and misrepresentation by the plaintiffs.

Here it cannot be said that "the alleged oral promise * * * is so clearly connected with the 'Guaranty' that the parties could have been expected to embody it in that writing." (*Braten v Bankers Trust Co.,* 60 NY2d 155, 162.) It was at the insistence of the plaintiffs that the line of credit be dealt with separately. Plapinger alleged that "Citibank advised us that although the terms of the line of credit were fixed as to the amount, interest and terms of repayment, the term loan and the line of credit had to be treated as two distinct transactions."

It was error to hold that defendant's unconditional guarantees barred the defense of fraud or misrepresentation. As Judge Jasen stated in a similar case, "Carried to its logical extreme, Special Term's reliance on *Mount Vernon Trust Co.* could be read as supporting a view that the public policy expressed therein would prevent the maker or guarantor of a note held by a bank from ever raising any defenses to that note. This, of course, is not what was intended in that case, and it would be completely contrary to law." (*Long Is. Trust Co. v International Inst.,* 38 NY2d 493, 497.)

Accordingly, the order below should be reversed and plaintiff's motion for summary judgment should be denied.